```
                 UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF INDIANA
                      SOUTH BEND DIVISION
```

JEREMY TABISZ,                    )
                                  )
            Plaintiff             )
                                  )
       vs.                        )   CAUSE NO. 3:19-cv-1013 RLM-MGG
                                  )
FOREMOST INSURANCE GROUP,         )
                                  )
            Defendant             )

## OPINION AND ORDER

It's a credit to the nation's court systems that today's issue arises so infrequently: defendant Foremost Insurance Group moves to dismiss Jeremy Tabisz's suit against it on grounds of witness tampering.

While at St. Joseph's Medical Center for a chest X-ray on March 12, 2019, Abigail Stantz decided to visit her neighbor, Mr. Tabisz, who was in the hospital with severe intoxication and a psychotic episode. Ms. Stantz says that during that visit, Mr. Tabisz told her he planned to burn his house down and go across the country with his dog with $80,000 in insurance proceeds. Four nights later, a fire destroyed Mr. Tabisz's house.

Foremost Insurance denied coverage on the belief that Mr. Tabisz had burned the house down, and Mr. Tabisz brought this suit against Foremost in the St. Joseph Superior Court. Foremost removed the case to this court, with federal jurisdiction based on the parties' diverse citizenship.

The attorney who filed the case on Mr. Tabisz's behalf withdrew his appearance for reasons unrelated to this case, leaving Mr. Tabisz unrepresented

1

for a few months. While Mr. Tabisz was between lawyers, Foremost served him with notice of its intent to take several depositions on Monday, June 29, 2020 (all events pertinent to the dismissal motion happened in 2020), beginning with Ms. Stantz. On Saturday, June 27, Mr. Tabisz and Ms. Stantz had a conversation, which might have been bisected by an hour or two, in which the deposition and the hospital conversation were discussed. This is the conversation in which Foremost claims that Mr. Tabisz tampered with witness Stantz.

Mr. Tabisz made an audio recording of part of the conversation; he believes he recorded 70 minutes of an 80-minute conversation; Ms. Stantz believes the conversation was longer and was divided by an intermission. He says he made the recording because he wanted to protect himself since he had no lawyer. The court can't evaluate the credibility of that explanation because the court doesn't understand a connection between self-representation and recording the conversation. Re-creating the entire conversation is surprisingly difficult because the participants' memories diverge dramatically, and surrounding events cast doubt over everything.

We begin with what is undisputed: On the morning of Friday, June 26 (the day before the conversation on which Foremost relies), Ms. Stantz left a message on Foremost's attorney's voice mail. She expressed concern that if she testified in court, Mr. Tabisz's "very, very evil" friends might be there and retaliate against her. She said she had suffered 13 or 14 strokes and her doctor would be concerned that she was risking another by testifying. She expressed the belief

2

that it was her duty to testify but that she didn't want to testify if Mr. Tabisz would be there. Ms. Stantz left her number and asked the attorney to call back. Ms. Stantz testified that she was scared when she made that call.

Ms. Stantz left another voicemail for Foremost's lawyer at 7:00 p.m. on Saturday, June 27 (though Ms. Stantz said on the message that it was Friday). She said she had just spoken to Mr. Tabisz, who didn't want her testify: "he just felt that I did not need to testify, that I need to stay home and keep my mouth shut, and he would handle everything, and I didn't need to go to court or anything like that. And he also said he was worried, too, because he also knows I have TIAs, too." Ms. Stantz said she planned to come to the deposition, but she expected to bring a note from her doctor saying whether she should testify. She asked the lawyer not to tell Mr. Tabisz about the call because "he will get furious, and he will retaliate, probably …."

Ms. Stantz left two messages on Foremost's attorney's voicemail on Sunday, June 28 (the day before the scheduled deposition). In her 1:30 call, Ms. Stantz said she didn't think she'd be able to make to the deposition, that Mr. Tabisz had been "counseling" her and would go after her. Ms. Stantz again expressed concern that Mr. Tabisz's "buddies" might be there. She said she couldn't come, and that she "like[s] to breathe." She also made reference to Mr. Tabisz having brought her husband (who was four years dead) into it and having said something about red powder. Ms. Stantz testified that she was "really shaky" when she made that call and wound up in the hospital for three days (in fact, she gave a sworn statement the following day).

3

The day's other voice message makes the most specific references to threats, and so is quoted here in full, with apologies for length of the quoted material:

> Hi, Julia. This is Gail Stantz – or Abigail Stantz. I have a big problem with Jeremy. I'm getting threats now from him. He told me I need to watch my mouth, watch what I do, because he can put me behind bars. And then he started recording everything we talked about, and he said she was going to put me under the bus, and I said whatever. And then he said, "Oh, by the way, I'm recording everything you say." And I said, "Oh, okay, great, that's fine, I have nothing to hide."
> But I'm at the point now that I'm having a headache in the back from my stroke.
> He told me that I had no business – that I need to watch my back or something. I don't remember what it was exactly, but he, he made it clear to me that I need to watch what's going on, and I had no business being there, and he's going to make sure that I don't go. And that was, you know, we talked about that before he started recording everything on his cell phone. Everything. He took pictures of me talking to him, talking to him, answering his questions. And I answered them for him the way he would want them so that he doesn't retaliate on me. He is right, I was always wrong, according to him.
> And I am going to tell you want, I am terrified, I have not slept in 13 nights now. I am just stressed out because of him, and his house fire, and everything that's going on. I want out. I want to live. I don't want to het threatened by other people that are being called as a witness. I, I don't want it, and I – I cannot have it.
> And I'm hoping that Dr. Afyouni did a paper for me – I will find out more tomorrow – that I'm not able to testify. I do have one stating I have strokes. I do have a paper with that already. But I just want you to know that I am not – I cannot testify. I know it's late and I backed out before, but I have a habit called breathing, and I don't want to be harassed by anyone. I don't want to be questioned by anyone.
> I usually – 99 percent of the time, I keep to myself. I've got things to do and it's, I don't, I talk to Jeremy once in a while, and last night, it just so happened we had a long conversation about when he was in the hospital and everything like that, and I'm not – I'm not to bring anything like that up for him?
> So anyway, I just – I'm sorry, I cannot do this. You probably don't have a case now, but I am sorry. I, I just can't do it. And I cannot deal with the threats. He threatened my dead husband with

> something called red powder. My husband has been dead almost four years. He had no right bringing that up, that my husband died, and he knew what that was. He tried telling me a couple of months back that my husband was in Iraq. My husband's never been in a war. He's never fought or anything. He was in the Army, but he never left Fort Riley, Kansas, until he got discharged.
>
> So it's just – I think – I'm sorry, Julia, I am so sorry. I'm so sorry. Hopefully you can prosecute him without me there because I cannot – he told me about other people that are testifying, and that will also come after me. So I just can't do this. I can't do it. I like to breathe. I can't do it. I'm sorry, Julia. Have a great day. Bye. And good luck, Julia. Bye.

[Exhibit 35]. Ms. Stantz testified that she was drained, stressed and scared when she left that message because she knows what Mr. Tabisz is and what he's done to other people.

Foremost notified Mr. Tabisz that it was cancelling the deposition, then conducted something akin to a deposition, with Ms. Stantz giving sworn testimony in response to Foremost's attorney's questions, with a court reporter transcribing the testimony. Mr. Tabisz wasn't notified of the proceeding and wasn't present. That sworn, un-cross-examined testimony is in evidence as Exhibit 23. In that statement, Ms. Stantz talked of the death of Mr. Tabisz's wife (for which Ms. Stantz holds Mr. Tabisz responsible), the conversation in the hospital, and the fire at Mr. Tabisz's house. She authenticated, and was asked briefly about, each of the voicemails.

As mentioned before, Mr. Tabisz used his phone to record part of the conversation in which threats are alleged to have been made. Mr. Tabisz testified that he started recording ten minutes into the conversation; Ms. Stantz appears to believe that the conversation was divided by an intermission of an hour or two

in which she and Mr. Tabisz separated, and isn't sure whether the recording was made before or after the intermission.

The recording mildly corroborates the voicemails Ms. Stantz left for Foremost's attorney. Seven times during the recording, Mr. Tabisz told Ms. Stantz that she didn't have to comply with the subpoena because it wasn't signed by a judge. He told her that if she brought a doctor's note to evade the deposition Foremost would try to subpoena her medical records; when Ms. Stantz responded that she would just "go ahead and do it and get it over with," Mr. Tabisz said, "No. Don't give them your rights like that." He told her that anyone is allowed to enter the deposition unless a court orders otherwise ("I could come and bring twenty friends if I wanted to, but –"). Toward the end of the recording, Ms. Stantz asked, "Do you want me show up?" Mr. Tabisz told her it was her choice and went on to say he had reasons to have her testimony thrown out. Mr. Tabisz told her several times that he didn't remember being at the hospital on March 12 at all. Near the end of the conversation, Mr. Tabisz said the deposition questioning "might focus more on the hospital and other things too . .  And that was inside a hospital under medical treatment. You do not have a right to talk about anything that was said. Period. … And I will press charges against you if you do. … Because I have that right."

Much of the recorded conversation consisted of brief discussions of topics not pertinent to today's issue. At some points, Ms. Stantz seemed to assure Mr. Tabisz that her testimony would be helpful to him, emphasizing such things as that he wasn't at the house when the fire broke out (a point she raised repeatedly)

that she'd known Mr. Tabisz since he was a child, and how good his claim against Foremost was. Ms. Stantz's words seemed at a few times to indicate she was trying to leave and end the conversation, but Mr. Tabisz would raise another topic and the conversation would continue.

The recordings are of far greater evidentiary value than the testimony of Mr. Tabisz and Ms. Stantz in this case. When testifying as a witness at the hearing on the dismissal motion, Mr. Tabisz remembered little of what he was asked about. His memory lapses were surprising: this was a proceeding to decide whether his lawsuit would be dismissed, not because of the facts giving rise to his insurance claim, but rather because he is said to have tampered with a witness. "Witness tampering" is a phrase that a non-lawyer might see as carrying the possibility of a criminal charge. One would think that a person in Mr. Tabisz's situation would prepare for the hearing by doing all he can to refresh his recollection for purposes of testifying. If Mr. Tabisz tried to refresh his memory, it was for naught.

Mr. Tabisz attributed his inability to recall due to the passage of time and to post-traumatic stress disorder. That may be so, but his inability to recall (which mostly seemed to impede his answers on cross examination) hurt his credibility.

When testifying, Mr. Tabisz said several times that he's not a lawyer. But he told Ms. Stantz repeatedly that her deposition subpoena was inadequate. He said he'd found that information had come from the internet. Foremost's counsel wanted Mr. Tabisz to find the internet site that said that during the evidentiary

hearing; the court disallowed the demonstration. People representing themselves have brought goofier (and equally self-serving) theories into the courts of this circuit, *see, e.g.*, Bey v. State, 847 F.3d 559, 560 (7th Cir. 2017) (purported member of Moorish Science Temple of America); United States v. Benabe, 654 F.3d 753, 767 (7th Cir. 2011) (sovereign citizens: "We have repeatedly rejected their theories of individual sovereignty, immunity from prosecution, and their ilk."); Szopa v. United States, 453 F.3d 455, 457 (7th Cir. 2006) (tax protester sanctioned $2,700), and those propositions have undoubtedly found permanent homes on the internet. The court believes that Mr. Tabisz read on the internet that a subpoena is unenforceable if signed by an attorney but not by a judge. It also seems likely that he would have run across accurate statements about enforceability of a subpoena not signed by a judge.

Mr. Tabisz didn't attribute his recorded comments about HIPAA to the internet; he simply said he misunderstood HIPAA at the time of the recorded conversation.

Ms. Stantz's testimony was neither more nor less credible than that of Mr. Tabisz. Her memory of events was sharper, but her grasp of the timing and sequence of events was shakier. Some of that might have been due to questions phrased as lawyers and judges are accustomed, such as "Did you call the police on Jeremy?" When that question was asked during a line of questions about the recorded pre-deposition conversation, the court understood it to ask whether she called the police that day. Ms. Stantz might not have understood it that way, because she first answered "yes" and later said she didn't call the police. Her

8

answers are consistent with her having "called the police on Jeremy" at some time in the past, but not on the day of the conversation. But the answers also are consistent with a witness who was confused.

Long past events, such as conversations between Mr. Tabisz and Ms. Stantz's husband, who died four years ago, and the death of Mr. Tabisz's wife, for which Ms. Stantz holds Mr. Tabisz responsible, weaved in and out of her testimony as though they might have been contemporary events. To ascertain from her testimony a chronological order the things Ms. Stantz testified about, would be nearly impossible. The court puts no stock in Ms. Stantz's testimony at the hearing on the motion to dismiss. Since her testimony was the only evidence that her conversation with Mr. Tabisz was divided in two, the court is left with the tape, with implies that it was one continuous conversation. Ms. Stantz's voice mails to Foremost's attorneys referred to threats not contained on the audio recording, but the court gives no greater weight to her unsworn statements about the conversation than to her testimony.

Mr. Tabisz tried to keep Ms. Stantz from testifying at her deposition. He volunteered seven times that her subpoena didn't require her to appear. No question from Ms. Stantz prompted any of those statements. Mr. Tabisz volunteered several times at the evidentiary hearing that he wasn't a lawyer, but that didn't keep him from offering his unsought internet-based legal advice designed to keep Ms. Stantz from showing up for the next day's difference. That Mr. Tabisz might have believed what he was saying wouldn't matter to his purpose: he didn't want Ms. Stantz to appear for her deposition.

9

Mr. Tabisz knew at the time of the conversation that Foremost expected Ms. Stantz to be a significant witness against him. He was representing himself at that point and had full access to any discovery materials in his first attorney's file. Mr. Tabisz's original attorney withdrew on April 1. Mr. Tabisz's May 14 motion for appointment of counsel was denied on May 18. The magistrate judge denied that Mr. Tabisz's May 22 motion for reconsideration (calling it an "appeal") on May 27. Mr. Tabisz filed an amended motion for counsel on June 1 (supported by material he purported to seal) and the magistrate judge denied that motion on July 7. Mr. Tabisz's current counsel appeared on July 21, and Foremost field this motion to dismiss the next day. In all Mr. Tabisz was unrepresented from April 1 to July 21; all the events giving rise to the motion to dismiss occurred during those sixteen weeks.

The strongest evidence of Mr. Tabisz's awareness of Ms. Stantz's importance as a witness came late in the recording of the conversation, when Ms. Stantz, apparently trying to allay Mr. Tabisz's concern, said (apparently referring to the time of the fire, "There was nobody in there. You were not in there." Mr. Tabisz changed the subject: "They might focus more on the hospital and other things too." The new line of conversation went this way:

Stantz: The only thing I seen in the hospital is that you were laying there on a gurney on a bed. And that was it.

Tabisz: And that was inside a hospital under medical treatment. You do not have a right to talk about anything that was said. Period.

Stantz: That's right.

Tabisz: And I will press charges against you if you do.

10

| | |
|---|---|
| Statntz: | I'm not gonna say anything. |
| Yabisz: | Yeah. |
| Stantz: | Because it's nobody else's business. |
| Tabisz: | Because I have that right. |
| Stantz: | Right. And it's nobody else's business. I just – no. And it's not. I don't know why they would bring that up. That has nothing to do with your trailer or your truck or anything. |
| Tabisz: | Yeah, no. And exactly. It's not out of like I think you would lie about it or any of that. I was not coherent. |
| Stantz: | No, you were not here. You were here, but physically and mentally you were talking about everybody. I mean things from your past – everything. Nothing had to do with this. Nothing had to do with it. And you got to understand you went through a lot. |

The compelling inference from Mr. Tabisz's threat to "press charges" if Ms. Stantz testified to what he said in the hospital is that Mr. Tabisz knew that Ms. Stantz's version of his remarks in the hospital would hurt his case, maybe badly. Mr. Tabisz testified that he feared that he said things during his PTSD episode about his experience in the service, but that explanation simply isn't believable in light of the credibility issues already discussed and the record as a whole.

In short, Mr. Tabisz engaged in witness tampering two days before Foremost was to take the deposition of important witness Abigail Stantz. He did so by telling her over and over that she didn't have to comply with the deposition subpoena, and by telling her he would press charges against her if she revealed what he told her in the hospital four days before the house fire on which his claim against Foremost is based.

Foremost seeks an order of dismissal based on that witness tampering. Dismissal might be appropriate under Federal Rule of Civil Procedure 37 or the court's inherent authority to manage the proceedings and to discourage misconduct. Chambers v. NASCO, Inc., 501 U.S. 32, 46-50 (1991); Ramirez v. T&H Lemont, Inc., 845 F.3d 772, 776 (7th Cir. 2016). A court's power to sanction a party for hiding evidence or lying in his deposition extends "to a party soliciting a witness to lie at his court-ordered deposition." Ramirez v. T&H Lemont, 845 F.3d at 776. Although dismissal is severe, a court has discretion to dismiss a suit as a sanction. Chambers v. NASCO, 501 U.S. at 45 (*citing* Roadway Exp., Inc. v. Piper, 447 U.S. 752, 756 (1980). "[W]itness tampering is among the most grave abuses of the judicial process, and as such it warrants a substantial sanction." Ramirez v. T&H Lemont, Inc., 845 F.3d at 782 (*citing* Secrease v. W. & S. Life Ins. Co., 800 F.3d 397, 402 (7th Cir. 2015)); Ty Inc. v. Softbelly's, Inc., 517 F.3d 494, 498 (7th Cir. 2008) ("Trying to improperly influence a witness is fraud on the court and on the opposing party.").

To dismiss a case as a sanction for witness tampering, a court must find willfulness, bad faith, or fault by a preponderance of the evidence. Ramirez v. T&H Lemont, Inc., 845 F.3d at 777-779. Even without such a finding, the court has inherent authority to award attorney's fees to the non-offending party. Chambers v. NASCO, 501 U.S. at 45. Willfulness is easily found on this record, for the reasons accompanying the finding that Mr. Tabisz engaged in witness tampering. With no request for guidance from Ms. Stantz, whom Mr. Tabisz knew to be an important witness, Mr. Tabisz wrongly advised her on the law. He told

12

her seven times she didn't need to comply with the subpoena, and gratuitously threatened her with "charges" if she disclosed the contents of his statement in the hospital. He told Ms. Stantz, who feared Mr. Tabisz's friends, that anyone who wanted to could attend the deposition, including Mr. Tabisz's friends Isaiah and Josh, whom she believed had killed a man.

Mr. Tabisz wanted to keep Ms. Stantz from giving her deposition. He knew that's what he was doing as he spoke to her. Mr. Tabisz's tampering with the witness was willful. And until Foremost's counsel arranged for Ms. Tabisz to give her sworn statement without Mr. Tabisz's attendance, he succeeded. The court has discretion to dismiss Mr. Tabisz's case as a sanction.

A sanction under Rule 37(b) must be proportionate to the sanctioned party's conduct. Langley by Langley v. Union Elec. Co., 107 F.3d 510, 515 (7th Cir. 1997). Considerations relevant to proportionality include the extent of the misconduct, the ineffectiveness of lesser sanctions, the harm from the misconduct, and the weakness of the case. Donelson v. Hardy, 931 N.E.3d 565, 569 (7th Cir. 2019); see Nelson v. Schultz, 878 F.3d 236, 239 (7th Cir. 2017). The court can't evaluate the weakness of Mr. Tabisz's case at this stage of the proceedings, other than to note that his pre-fire declaration of intent seems likely to weaken his case at trial. The witness intimidation related to a single, but very important, witness on a single day, but consisted of seven inaccurate statements of the witness's right to ignore the subpoena, and one inaccurate statement of Mr. Tabisz's own rights under HIPAA.

13

On the other side of the ledger, Foremost doesn't appear to have suffered any harm that an award of fees and costs occasioned by the witness tampering can't fix. Ms. Stantz wasn't too intimidated to appear and testify at the hearing on the motion to dismiss, and Foremost was able to get Ms. Stantz's information at the recorded sworn statement she gave in lieu of the deposition. Foremost surmises that if other witnesses learn that Mr. Tabisz threatened potential witness Stantz, they, too, might be reluctant to testify; the court finds nothing in the record to move that concern from the category of speculation to the category of inference.

In the final analysis, the court can't find its way to the conclusion that dismissal is an appropriate and proportionate sanction under the facts before it. As noted earlier in this opinion, "witness tampering is among the most grave abuses of the judicial process, and as such it warrants a substantial sanction." Ramirez v. T&H Lemont, Inc., 845 F.3d 772, 782 (7th Cir. 2016). But not all witness tampering is equal. This witness tampering was done by a party who had no lawyer, who was battling PTSD, and who was trying unsuccessfully to get the court to give him a lawyer. The strongest evidence that Mr. Tabisz did any witness tampering flows from his inexplicable belief that he should record the conversation with Ms. Stantz because he didn't have a lawyer. It's hard to think that Mr. Tabisz thought his efforts would keep her information from Foremost – these were Saturday comments to keep her from attending Monday's deposition. The likely result of Mr. Tabisz's tampering with Ms. Stantz was that her deposition would be delayed to a date when he might have a lawyer.

Mr. Tabisz acted improperly and knew or should have known that it was improper. It was still witness tampering, conduct that goes to the heart of the nation's system of civil justice. He should be sanctioned, but dismissal of his case shouldn't be the sanction. Ordering Mr. Tabisz to pay the attorney fees and costs that Foremost had to incur because of his witness tampering is an appropriate part of the sanctions.

Foremost asked for two remedies besides a fee award if the case weren't dismissed. It asked that the sworn statement of Ms. Stanz that Foremost took on June 29 be deemed to be her deposition, and that any further deposition of Ms. Stantz be forbidden. It's reasonable that the sworn statement be treated as Ms. Stantz's deposition: Foremost had to take unusual steps because of Mr. Tabisz's witness tampering. But it's also reasonable that Mr. Tabisz, now represented by counsel, should be able to depose an important witness, so the court will allow him to do so upon proper notice; given the events leading up to this order, Mr. Tabisz can attend the Stantz deposition only by telephone. Finally, the court agrees with Foremost that the jury should be made aware, through a jury instruction that will be as fair to both sides as possible, of Mr. Tabisz's effort to keep Ms. Stantz from attending her scheduled deposition in June and to keep her from testifying to Mr. Tabisz's statements in the hospital.

The court GRANTS IN PART and DENIES IN PART Foremost's motion to dismiss [Doc. 55]. The motion is DENIED to the extent it seeks dismissal as a sanction for Mr. Tabisz's conduct, and GRANTED to the extent it seeks an award of attorney fees and costs Foremost incurred because of his conduct. The court

ORDERS Foremost to submit an itemized and verified statement of attorney's fees and costs incurred in seeking the motion to dismiss by October 5. Mr. Tabisz shall have until October 19 to file any objections, and Foremost shall respond to any objections by October 26.

SO ORDERED.

ENTERED:   September 16, 2020

>   /s/ Robert L. Miller, Jr.
> Judge, United States District Court